# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  **v.**                                          **Case No. 22-CR-254**

**JAVION JOHNSON**
    **Defendant.**

## DECISION AND ORDER

Defendant Javion Johnson moves to dismiss the indictment charging him with possessing ammunition as a felon, contrary to 18 U.S.C. § 922(g)(1). He argues that, as applied to the facts of this case, § 922(g)(1) is unconstitutional under the Second Amendment as construed in N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022). For the reasons that follow, his motion will be denied.

### I. THE SECOND AMENDMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. For most of the nation's history, courts construed the Amendment as protecting a collective right, necessary to safeguard the people's common interest in protection by a militia. See, e.g., Gillespie v. City of Indianapolis, 185 F.3d 693, 711 (7th Cir. 1999). In District of Columbia v. Heller, 554 U. S. 570 (2008), and McDonald v. Chicago, 561 U. S. 742 (2010), the Supreme Court recognized that the Second and Fourteenth Amendments protect the individual "right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." Bruen, 142 S. Ct. at 2122. In Bruen, the Court recognized "an individual's right

to carry a handgun for self-defense outside the home." Id.

Beyond these general principles, it is important to acknowledge the specific holdings—and limitations—in these cases. In Heller, after recognizing an individual right, the Court struck down a regulation generally prohibiting the possession of handguns in the District of Columbia. 554 U.S. at 574-75, 628. The Court cautioned:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626-27.

In McDonald, the Court extended Heller's Second Amendment holding to the states, striking down a Chicago ordinance effectively banning handgun possession by almost all private citizens residing in the city. 561 U.S. at 750. The Court then reiterated its assurance that recognizing an individual right, now extended to the states, did not doom all firearm regulation:

> It is important to keep in mind that Heller, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.

Id. at 786 (internal citations and quote marks omitted).

In Bruen, after extending the right to carrying handguns for self-defense outside the

2

home, the Court struck down a New York licensing regime requiring the applicant to demonstrate a special need for self-defense. 142 S. Ct. at 2122. This time, the Court sought to allay the "doomsday" predictions by reiterating, over and over, more than a dozen times, that the right belonged to "law-abiding" citizens. See United States v. Johnson, No. 23 CR 156, 2023 U.S. Dist. LEXIS 171452, at *4 (N.D. Ill. Sept. 26, 2023). The concurring Justices likewise stressed the narrowness of the Court's decision. See Bruen, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."); id. at 2159 (Alito, J., concurring) ("All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional."); id. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (noting that states may continue to conduct background checks before issuing licenses and quoting the limitations identified in Heller).

While it would be tempting to say these passages resolve the issue raised in this case, the Seventh Circuit recently remanded a Second Amendment challenge to § 922(g)(1) for application of Bruen's text and history test. See Atkinson v. Garland, 70 F.4th 1018, 1022 (7th Cir. 2023); see also United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) ("Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration."). I must therefore apply the Bruen test.[1]

---

[1]Earlier this year, I rejected a Second Amendment challenge to § 922(g)(9) based in part on pre-Bruen Seventh Circuit caselaw upholding that provision. United States v. Patterson, No. 22-CR-52, slip op. at 6 (E.D. Wis. Apr. 4, 2023) (citing Skoien). I noted that the actual holding of Bruen was quite narrow, invalidating a single provision of New York's concealed-carry licensing regime, and that nothing in the decision suggested the Court intended to extend Second Amendment rights to prohibited persons. I thus concluded that, unless and until the

3

## II. BRUEN

In Bruen, the Court held:

When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

Id. at 2129-30 (internal quote marks omitted).

The Court explained:

While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that Heller and McDonald point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in Heller and repeated in McDonald, individual self-defense is the central component of the Second Amendment right. Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry.

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

Id. at 2132-33 (internal citations, quote marks, and footnote omitted).

---

court of appeals or Supreme Court said otherwise, the specific holdings of previous Seventh Circuit decisions such as Skoien remained good law. In Atkinson, decided two months after Patterson, the Seventh Circuit remanded for application of Bruen, despite previous caselaw upholding § 922(g)(1). 70 F.4th at 1022. It is thus clear that I must apply the Bruen test. This case involves the alleged possession of ammunition, rather than a firearm, but the parties make nothing of that distinction. I will therefore assume that the Bruen test applies equally to guns and bullets.

4

## A. Text

Defendant argues that his conduct—the possession of a firearm—is covered by the plain text of the Second Amendment and is presumptively protected. This shifts to the government the burden of proving § 922(g)(1) is part of the nation's historical tradition of firearm regulation. (R. 27 at 4.)

Not so fast, responds the government. The government contends that felons do not fall within "the people" covered by the Second Amendment, the protections of which extend only to "'law-abiding, responsible citizens,'" Bruen, 142 S. Ct. at 2131 (quoting Heller, 554 U.S. at 635), who are "members of the political community," Heller, 554 U.S. at 580. The government points to Thomas Cooley's "massively popular 1868 Treatise on Constitutional Limitations," cited with approval in Heller, 554 U.S. at 616, which acknowledged the exclusion of "the idiot, the lunatic, and the felon" from "the people in whom is vested the sovereignty of the State." (R. 29 at 7.) The government notes that felons have long been denied the ordinary rights of citizenship, including the rights to vote, serve on juries, and hold public office. (R. 29 at 7-8.) Consistent with this history, Heller assumed that certain persons were "disqualified from the exercise of Second Amendment rights," 554 U.S. at 635, and Bruen repeatedly referred to the "law-abiding citizens" entitled to the Amendment's protections.

Defendant counters that in Heller the Court relied on the use of the term "the people" in the First and Fourth Amendments to support the conclusion that the Second Amendment, too, protects an individual right that belongs to "all Americans." (R. 27 at 5, quoting Heller, 554 U.S. at 581.) The Seventh Circuit has sent mixed signal on this issue. Compare United States v. Yancey, 621 F.3d 681, 684-85 (7th Cir. 2010) ("Whatever the pedigree of the rule against even nonviolent felons possessing weapons (which was codified in federal law in 1938), most

5

scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"), with United States v. Meza-Rodriguez, 798 F.3d 664, 670 (7th Cir. 2015) (concluding "that the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights"); see also United States v. Posey, No. 2:22-CR-83 JD, 2023 U.S. Dist. LEXIS 22005, at *12-15 (N.D. Ind. Feb. 9, 2023) (discussing the "civic virtue" theory). Atkinson suggested the issue was an open one. 70 F.4th at 1023.

Defendant cites Range v. AG United States, 69 F.4th 96, 101 (3rd Cir. 2023), where the court concluded that, because the criminal histories of the plaintiffs in Heller, McDonald, and Bruen were not at issue, the references to "law-abiding, responsible citizens" were dicta. (R. 27 at 5-6.) The Range court further endorsed then-Judge Amy Coney Barrett's view, expressed in dissent in Kanter v. Barr, 919 F.3d 437, 452 (7th Cir. 2019), that while certain arms and activities may be outside the scope of the Second Amendment, all of the "people" are covered (though the legislature may constitutionally strip certain groups of that right). Finally, the Range court concluded that "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." 69 F.4th at 102. The court balked at the notion that the Second Amendment devolves authority to legislatures to decide whom to exclude from "the people." Id. at 102-03.

Other courts have concluded, post-Bruen, that the Justices' repeated references to "law-abiding, responsible citizens" cannot be dismissed as mere dicta. See, e.g., United States v. Hardy, No. 23 CR 129, 2023 U.S. Dist. LEXIS 184025, at *4-6 (N.D. Ill. Oct. 13, 2023). "Evaluating Heller, McDonald, and Bruen together, the Supreme Court has repeatedly asserted and guaranteed that the Second Amendment protects law-abiding citizens, not convicted

6

felons." Id. at *6. Nor is it necessary, these courts assert, to construe "the people" under the Second Amendment the same as "the people" under the First or Fourth Amendments. "Although the effort makes intuitive sense, a consistent reading of 'the people' is in tension with the reality that people lose certain constitutional rights when they are convicted of a felony." Id. at *10. In other words, legislatures have long exercised the authority to decide whom to exclude from "the people" for purposes of voting and serving on juries; the same should be true of firearm possession. See United States v. Rice, No. 3:22-CR-36, 2023 U.S. Dist. LEXIS 45182, at *17 (N.D. Ind. Mar. 17, 2023) ("As a matter of basic reasoning it is hard to reconcile how the Framers of the Constitution could conclude that felons could not be trusted to wield pens in voting booths or jury rooms, but they simultaneously found them capable of wielding arms in the public square."). Finally, these courts note that the phrase "law-abiding, responsible citizens" is not vague when considered in the context of the Justices' endorsement of "longstanding prohibitions on the possession of firearms by felons and the mentally ill." Hardy, 2023 U.S. Dist. LEXIS 184025, at *7; see also United States v. Crawford, No. 2:20-CR-084-PPS-APR, 2023 U.S. Dist. LEXIS 152201, at *9-10 (N.D. Ind. Aug. 29, 2023) ("I . . . conclude that the Supreme Court meant what it said—convicted felons are not law-abiding citizens protected by the Second Amendment.").

Absent further guidance from the Supreme Court, I cannot know whether the reference to "law-abiding citizens" was meant to limit the coverage of the Second Amendment right or whether it was simply "shorthand" meant to exclude groups that have historically been stripped of their Second Amendment rights. See United States v. Rahimi, 61 F.4th 443, 452 (5th Cir. 2023). Either way, the reference cannot be dismissed as mere dicta. As one judge recently noted, even under the latter theory, this language must be given some weight:

> This is not to say that the legal disabilities to which the government cites are not relevant in evaluating a regulation under the Second Amendment. The argument might very well be informative—after getting past the threshold issue of the plain text's coverage—in deciding whether there exists a historical analogue for the regulation at issue. But it is to say that discerning the meaning of the Second Amendment's plain text—specifically the word "people"—finds little help from the context of other amendments. What is left—and where the analysis started too—is just the plain text of the Second Amendment, and no reason to think that the word "people" does not cover, on its face, all persons—including a person convicted of a felony.

United States v. Gates, No. 1:22-CR-00397-1, 2023 U.S. Dist. LEXIS 157274, at *13-14 (N.D. Ill. Sept. 6, 2023). I will assume, arguendo, that felons are covered by the text of the Second Amendment and proceed to the next step, keeping in mind that nothing the Court has said so far casts doubt on "presumptively lawful regulatory measures" such as the "longstanding prohibitions on the possession of firearms by felons." Heller, 554 U.S. at 626-27 & n.26.

**B.   History**

The government argues that, even if the Second Amendment's text covers felons' possession of guns, § 922(g)(1) is nevertheless consistent with historical tradition delimiting the outer bounds of the right to keep and bear arms. The government relies on two lines of authority to support modern felon dispossession statutes.

First, the government points to firearm "disqualification" laws, enforced in the colonies at the time of the founding and previously in England, applicable to categories of persons deemed "untrustworthy." (R. 29 at 10-13.) In England, that included Catholics who refused to renounce their faith; in the colonies, Native Americans and Blacks were excluded, as were others who failed to demonstrate loyalty to the government. See United States v. Jackson, 69 F.4th 495, 502-03 (8th Cir. 2023) (relying on these laws); Hardy, 2023 U.S. Dist. LEXIS 184025, at *13-14 (same); Gates, 2023 U.S. Dist. LEXIS 157274, at *23 ("Though these

8

categorical bars on possession would, of course, be unconstitutional today (and are and were shameful), the regulations do evince a historical tradition of categorically disarming groups—including those deemed 'dangerous'—at the time of the ratification of the Bill of Rights."). The government further points to founding era proposals guaranteeing the right to bear arms, unless for crimes committed or real danger of public injury, and the absence of any meaningful dispute at that time as to the lawfulness of such regulations. (R. 29 at 14-15.) "Thus, the Founders recognized that individuals who commit crimes or pose a danger to society should not be protected by the Second Amendment." Hardy, 2023 U.S. Dist. LEXIS 184025, at *14-15; see also Jackson, 69 F.4th at 505-06:

> In sum, we conclude that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons. Consistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons, we conclude that the statute is constitutional as applied to Jackson.

Second, the government relies on the fact that, at the time of the founding, felons were usually executed and their assets (including firearms) seized following conviction. (R. 29 at 15-17.) As one commentator puts it, "The framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead." Dru Stevenson, In Defense of Felon-in-Possession Laws, 43 Cardozo L. Rev. 1573, 1587 (2022); see also Jackson, 69 F.4th at 503 (citing laws authorizing "punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate"); Medina v. Whitaker, 913 F.3d 152, 158 (D.C. Cir. 2019) ("[I]t is difficult to conclude that the public, in 1791, would have

9

understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."); Hardy, 2023 U.S. Dist. LEXIS 184025, at *17 ("Therefore, common sense dictates that firearm dispossession for felons is a 'comparable burden on the right of armed self-defense' when the historical alternatives were death or surrendering one's assets."); Gates, 2023 U.S. Dist. LEXIS 157274, at *27 ("As a matter of logic and experience, it makes sense that these extensive and exhaustive penalties for felonies—outright capital punishment and the forfeiture of all property—qualify as powerful evidence that mere firearms dispossession of felons is a 'comparable burden,' as Bruen frames the standard, 142 S. Ct. at 2133, to historical punishments for felonies.").

It is true that these laws did not specifically prohibit non-executed felons, per se, from possessing firearms. But Bruen does not require a "dead ringer." And as Judge Griesbach has sensibly noted:

> Modern laws prohibiting felons from possessing firearms are analogous but far more reasonable and just than the early English and revolutionary period laws that prohibited religious minorities or Native Americans from doing so. The modern laws also reflect the societal changes that have occurred since those earlier times, most notably, the reduction in the severity of penalties for most felonies, including the almost complete elimination of the death penalty; the degree to which firearms are no longer, for many, an essential tool for putting food on the table; and the technological improvements in commonly available firearms, making them far more efficient and dangerous than at the time the Second Amendment was ratified. Given this changed world, laws prohibiting firearm possession by felons are fully consistent with the historical understanding of the Second Amendment.

United States v. Watson, No. 23-CR-109, 2023 U.S. Dist. LEXIS 182631, at *15-16 (E.D. Wis. Oct. 11, 2023).

The government's presentation satisfactorily resolves the questions posed in Atkinson. Section 922(g)(1) addresses a general societal problem that has persisted since the 18th

10

century, disarming—now as then—untrustworthy adherents to the rule of law; history teaches that legislatures categorically disarmed groups they feared would disregard the law or which they deemed dangerous; felons were at the time of the founding subjected to capital punishment, estate forfeiture, and "civil death"; and these laws are far from "isolated instances of regulation." (R. 29 at 18-19.)

Defendant responds that the historical record from the time of the founding demonstrates that non-violent felons who completed their punishments were allowed to possess firearms, just like any other member of the community. He further notes that crime and recidivism are general societal problems that have persisted, yet laws specifically prohibiting felons from possessing firearms did not appear until the twentieth century. (R. 27 at 4, 9-11.) But Bruen does not require the government to identify historical twins to the modern regulation; for the reasons stated, the laws cited by the government constitute historical analogues.

## C. Post-Bruen Caselaw

The overwhelming weight of post-Bruen authority favors the government. See Vincent v. Garland, 80 F.4th 1197 (10th Cir. 2023) (holding that nothing in Bruen required the court to revisit its previous decisions upholding § 922(g)(1)); Watson, 2023 U.S. Dist. LEXIS 182631, at *17-18 ("Nearly every district court that has addressed the constitutionality of § 922(g)(1) since Bruen—in approximately 200 separate rulings—has concluded that the statute remains constitutional."); see also United States v. Alaniz, 69 F.4th 1124 (9th Cir. 2023) (rejecting Second Amendment challenge to firearm enhancement under U.S.S.G. § 2D1.1(b)(1)).

Defendant relies on Range, but that decision is unpersuasive. (R. 27 at 11.) The Third Circuit did not find § 922(g)(1) facially unconstitutional under the Second Amendment in a

11

criminal case. Rather, the majority issued a "narrow" ruling in Range's civil action seeking a declaratory judgment, holding that the government failed to show a tradition of disarming "people like Range," 69 F.4th at 106, who had been convicted of making a false statement to obtain food stamps, a misdemeanor under Pennsylvania law but which nevertheless triggered § 922(g)(1) because it was punishable by more than one year of imprisonment, id. at 98. The court dismissed the government's historical evidence of status-based restrictions, stating: "Apart from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances." Id. at 104-05.

First, it is unclear why historical firearm regulations must be ignored just because they would, today, run afoul of other constitutional provisions. Surely the Bruen Court knew that in rummaging through founding-era provisions judges would encounter odious racism, sexism, and religious bigotry; nothing in Bruen suggests that historical analogues cannot be considered just because they offend modern sensibilities.

Second, in requiring the government to identify historical regulations targeting people like Range, the court demanded the impossible. As one of the dissenting judges noted, the majority never really specified what makes a person "like Range," id. at 132 (Krause, J., dissenting), instead citing a variety of sympathetic circumstances: Range's non-violent predicate offense, the mitigated nature of his crime, his probationary sentence, his law-abiding life post-conviction, and his reason(s) for wanting a gun. Of course, no colonial or reconstruction era legislature passed laws specifically disarming persons with all of these

12

"individual circumstances."[2] But nothing in Bruen requires that level of specificity. In any event, the defendant in the present case, with a prior conviction for armed robbery with threat of force, who allegedly acquired a firearm prior to seeking a declaratory judgment that § 922(g)(1) did not apply to him, is plainly not "like Range."

**D.     As-Applied Challenge**

To the extent defendant intends to make an as-applied challenge, he presents no historical evidence supporting individual assessments regarding which felons should be covered by § 922(g)(1) and which felons should not. See Atkinson, 70 F.4th at 1023. As discussed above, the historical evidence supports categorical limitations. See Jackson, 69 F.4th at 502 ("Given these assurances by the Supreme Court, and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)."); Gates, 2023 U.S. Dist. LEXIS 157274, at *31 ("[I]n targeting groups of persons for dispossession, the historical regulations did not parse out an individualized 'dangerousness' assessment.").

In the absence of historical evidence requiring such an approach, it seems best for criminal courts to stay out of the business of deciding which felons are properly charged under § 922(g)(1). Congress has already exempted certain felons from the statute's coverage, see 18 U.S.C. § 921(a)(2), and some states have adopted gun rights restoration mechanisms, see Range, 69 F.4th at 131 (Krause, J., dissenting) (discussing these mechanisms). Moreover, "such an approach, applied to countless variations in individual circumstances, would obviously

---

[2]Pennsylvania did not authorize probationary sentences until 1909, William F. Henderson, Probation Detainers in Philadelphia: A Due Process Dud?, 12 Drexel L. Rev. 129, 139 (2019), and the food stamps program was not implemented until 1939, https://www.snaptohealth.org/snap/the-history-of-snap/ (last visited Nov. 1, 2023).

13

present serious problems of administration, consistency and fair warning." United States v. Torres-Rosario, 658 F.3d 110, 113 (1st Cir. 2011). Should courts distinguish between "violent" and "non-violent" felonies? The ongoing struggle to define the term "crime of violence" points up the difficulties of such an approach. See, e.g., United States v. Taylor, 142 S. Ct. 2015 (2022); Johnson v. United States, 576 U.S. 591 (2015). Should the court look at the nature of the predicate felony under a categorical approach? Should it consider the underlying facts of the case? Evaluate the defendant's post-conviction behavior? Must police before making an arrest or a prosecutor before laying charges conduct such an investigation?

It is also unclear how such determinations would be made in an individual criminal case. Defendant moves to dismiss pursuant to Fed. R. Crim. P. 12(b). In deciding such a motion, the court is generally limited to the four corners of the indictment, e.g., United States v. Di Fonzo, 603 F.2d 1260, 1263 (7th Cir. 1979), so considering additional facts about the predicate conviction or the defendant's post-conviction behavior would have to be done via some other procedural vehicle.[3]

Finally, defendant is a poor candidate for an exemption, given his previous conviction for armed robbery with threat of force. This is, by any reasonable definition, a crime of

---

[3]The dissenters from denial of rehearing en banc in Jackson suggested the district court could hold a sort of hybrid detention/sentencing hearing at which the "parties will present evidence and make arguments about whether the defendant is dangerous." United States v. Jackson, 2023 U.S. App. LEXIS 22991, at *26 (8th Cir. Aug. 30, 2023). While judges consider danger to the community in determining whether the defendant may be released pending trial, see 18 U.S.C. § 3143(a), and again when imposing sentence after conviction, see 18 U.S.C. § 3553(a)(2)(C), in neither instance is the judge deciding whether the case may proceed at all. In asserting that such a procedure would not be novel, the dissenters cited civil cases addressing as-applied challenges on motions for summary judgment, id. at *27, but there is no summary judgment analogue in criminal cases, United States v. Lupton, No. 07-CR-219, 2007 U.S. Dist. LEXIS 90549, at *11 (E.D. Wis. Dec. 10, 2007 (citing United States v. Yasak, 884 F.2d 996, 1001 (7th Cir. 1989)).

14

violence. As indicated above, at various points in his motion defendant cites historical evidence that non-violent felons could on completion of their sentences obtain firearms. (R. 27 at 4, 10.) Even if the historical record supported distinguishing between violent and non-violent felons, however that might be done, it would not help this defendant.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion to dismiss (R. 27) is denied.

Dated at Milwaukee, Wisconsin, this 3rd day of November, 2023.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge